(C. D. 194)

H. F. Ritchie & Co. *v.* United States

United States Customs Court, Third Division

(Decided July 28, 1939)

*Benjamin A. Levett* for the plaintiffs.

*Webster J. Oliver*, Assistant Attorney General (*Joseph F. Donohue*, special attorney), for the defendant.

Before Cline, Evans, and Keefe, Judges; Cline J., not participating

Evans, Judge: This is an action against the United States to recover money paid as customs duties upon an importation of what is described as "lime juice in casks," imported from the British West Indies. Duty was assessed on the commodity at the rate of 70 cents per gallon under the provisions of paragraph 806 of the Tariff Act of 1930, which, so far as pertinent, is in the following language:

(a) Cherry juice, prune juice, or prune wine, and all other fruit juices and fruit sirups, not specially provided for, containing less than one-half of 1 per centum of alcohol, 70 cents per gallon * * *.

The plaintiffs claim that this lime juice is unfit for beverage purposes and therefore dutiable at 5 cents per pound under the *eo nomine* provision in paragraph 48 of the same law, which provides for:

* * * juice of lemons, limes, oranges, or other citrous fruits, unfit for beverage purposes, 5 cents per pound.

The process by which this commodity is produced is described in the testimony as follows. The limes are run into a 3-roller mill which extracts the juice and crushes the entire lime; that the extracted juice contains the whole lime aside from the skin. After leaving the rollers the juice is passed through a strainer to take out the seeds. It is then run into hogsheads averaging about 50 gallons, in which condition it is shipped to this country. It was further shown by the testimony that this crushing process operates to squeeze the oil out of the skins as well as the juice from the body of the fruit.

From the foregoing description of the method of manufacture of this imported product it is clear that the same may be designated as crude lime juice. By that we mean lime juice that is imported as it was expressed from the limes without having undergone any further conditioning or processing. The question to be determined is whether the testimony in this case shows that such lime juice is unfit for beverage purposes. If it is unfit for beverage purposes then the importers' protest should be sustained. If, as imported, it is fit for beverage purposes, then the Government's classification should be sustained, because there appears to be no other paragraph under which duty could properly be taken.

The importers produced a witness who, according to his testimony, experimented with the imported product by testing his ability to consume relatively small amounts thereof in beverages. His testimony as to his method of use was as follows:

Well, I took that raw lime juice home with me and tried to make a drink out of it. I used it not only in cocktails, but I also used it in long drinks. As far as I recall now I tried it possibly 3 times in one week and again mixed up drinks 4 or 5 times the second week. Toward the middle of the second week I broke out in a rash on my body.

This sort of testimony, while not at all conclusive, cannot be dismissed as of no weight. After all, it is one man's experience from which he concluded that the imported article cannot be used as a beverage.

The importers called an experienced toxicologist to the stand, the effect of whose testimony was that the imported commodity if used as a beverage would be deleterious to the human system "because of the high volatile oil or essential oil content, which reads 1.8 c. c. in 100 c. c. of the material." He further elaborated upon the amount of such oils and stated that it ranges from 1 to 5 drops and gave the toxicological effect of these oils. He was then asked and permitted to answer the following question:

What would you say as to using it if it were diluted with water or other products?—A. If diluted, the same as with any other toxic substance—for instance, a strychnin solution is a volume poison but if you dilute it enough you can take it in small amounts and then it is a tonic, it is a stimulant. So this material also; if you dilute it enough then you can take it. But even in the diluted condition it is not proper therapeutic procedure to take even the diluted portion in large amounts every day for long periods.

The Government chemist gave testimony that contradicted the plaintiffs' witnesses as to the amount of volatile oil in the imported commodity, but no evidence was produced which contradicts the testimony offered by the plaintiffs to the effect that the article as imported is unfit for beverage purposes.

The Government relies principally on the case of *Crosse & Blackwell* v. *United States*, T. D. 48556, 70 Treas. Dec. 380, which related to a commodity apparently derived from merchandise like the imported article. In that case the lime juice was a settled juice, one from which all of the pulpy substances had been removed, which substances according to some of the testimony carried the greater portion of the oils. The commodity in the *Crosse & Blackwell* case, *supra*, was not, as Government counsel seems to think, put through any further process in order to be rendered potable. The statement in the decision therein was that—

It is used in making a product known as "lime cup," by the addition of equal parts of water, about 30 per centum of sugar, and a small quantity of fruit acid.

Nothing in that decision indicates that the settled lime juice there was further processed, while all the testimony in the instant case clearly shows that this commodity is put through a settling process and then "prefiltered," for the purpose of purifying the same and in order to eliminate deleterious substances. A portion of the imported commodity is removed and either discarded or used for some other purpose. In the *Crosse & Blackwell* case the entire imported commodity was used in the beverage prepared from the same.

In the cited case this court construed paragraph 48, *supra*, and held that Congress in enacting the provision for the juice of limes that was "unfit for beverage purposes" had in mind "commodities that because of defects, such as impurities, etc., are unsuitable for use *in* beverages rather than *as* beverages." We find nothing in the instant case as presented that would cause us to depart from that ruling.

It is our opinion that the importers have overcome the presumption of correctness attaching to the collector's action, in that it has been proven that the lime juice here involved is unfit for beverage purposes, that is, it is unfit for use in beverages. We therefore sustain the claim for assessment under paragraph 48, *supra*, at 5 cents per pound. Judgment will be rendered accordingly. It is so ordered.